The STATE of Ohio, Appellee,

v.

PRADE, Appellant.

[Cite as *State v. Prade* (2000), 139 Ohio App.3d 676.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 19327.

Decided Aug. 23, 2000.

678

680

*Michael T. Callahan,* Summit County Prosecuting Attorney, and *Paul Michael Maric,* Assistant Prosecuting Attorney, for appellee.

*Kerry O'Brien* and *Susan B. Vogel,* for appellant.

SLABY, Presiding Judge.

Defendant, Douglas E. Prade, has appealed from his convictions by the Summit County Court of Common Pleas for aggravated murder; interception of wire, oral, or electronic communications; and possession of criminal tools. We affirm.

On February 27, 1998, defendant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification. On March 27, 1998, a supplemental indictment was filed charging defendant with four counts of interception of wire, oral, or electronic communications, in violation of R.C. 2933.52, and one count of possession of criminal tools, in violation of R.C. 2923.24. On May 5, 1998, a second supplemental indictment was filed charging defendant with an additional count of interception of a wire, oral, or electronic communication, in violation of R.C. 2933.52. On May 26, 1998, a third supplemental indictment was filed charging defendant with a sixth charge of interception of a wire, oral, or electronic communication, in violation of R.C. 2933.52.

On April 1, 1998, defendant moved the trial court for a change of venue, alleging that due to the pervasive media publicity, it was impossible to hold a fair and impartial trial in the jurisdiction in which the trial would otherwise be held. On April 6, 1998, the trial court ruled that the motion for change of venue would be ruled upon at trial. Defendant renewed his motion for a change of venue at the close of the state's case. The trial court subsequently overruled that motion.

On July 7, 1998, defendant moved to sever the supplemental indictment counts pertaining to interception of wire, oral, or electronic communications and posses-

sion of criminal tools from the original indictment for aggravated murder and the firearm specification. On July 30, 1998, the trial court held that the joinder of the offenses was appropriate under Crim.R. 8(A), and that defendant failed to show actual prejudice which would arise from such joinder. Based upon these conclusions, the trial court denied defendant's motion to sever.

On September 24, 1998, following a jury trial, defendant was found guilty of all charges. Defendant was sentenced to life imprisonment on the charge of aggravated murder; two years of incarceration for each of the two counts of interception of wire, oral, or electronic communications, felonies of the third degree; one and a half years of incarceration for each of the four counts of interception of wire, oral, or electronic communications, felonies of the fourth degree; one year of incarceration for the crime of possessing criminal tools; and three years of mandatory incarceration for the firearm specification. The sentences for aggravated murder and the firearm specification are to run consecutively. The sentences for the four counts of interception of wire, oral, or electronic communications, felonies of the fourth degree, are to run concurrently with each other and concurrent with the sentence for aggravated murder. The sentences for the two counts of interception of wire, oral, or electronic communications, felonies of the third degree, are to run consecutively with each other and consecutive to the sentence for aggravated murder. Defendant timely appealed and has raised seven assignments of error for review.

## ASSIGNMENT OF ERROR I

"The trial judge erred when she failed to sever the supplemental indictment counts for interception of wire, oral or electronic communications, R.C. 2933.52, and possessing criminal tools, 2923.24 from the original indictment for aggravated murder, R.C. 2903.01(A) and firearm specification, 2941.145."

In his first assignment of error, defendant has argued that the trial court erred by denying his motion to sever the supplemental indictment counts from those in the preliminary indictment. Defendant has alleged that he was prejudiced by the fact that the failure to sever permitted the state to present evidence of multiple crimes committed against his wife, Dr. Margo Prade ("Margo"). This court disagrees.

An appellate court may reverse a trial court's ruling denying severance only where the accused shows that the trial court abused its discretion. *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298. In order to establish error on the part of the trial court in denying severance of the charges under Crim.R. 14, defendant has the burden of affirmatively proving that (1) "his rights were prejudiced," (2) he provided the trial court with sufficient information to

permit it to "weigh the considerations favoring joinder against the defendant's right to a fair trial," and (3) "the [trial] court abused its discretion in refusing to separate the charges for trial." *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

On July 7, 1998, defendant moved the trial court to sever the charges. In his motion, defendant alleged that he would be prejudiced by the joinder of the offenses because the jury would impermissibly establish a link between the charges. Without any evidence to support his statements, defendant baldly asserted that there was no nexus between the wiretapping charges and the aggravated murder charge. Defendant contended in his motion that "the evidence [was] not interlocking and the alleged offenses were days apart."[1] After reviewing the evidence submitted to the trial court, this court concludes that defendant failed to provide the trial court with sufficient information to determine that the charges should have been severed.

Even assuming *arguendo* that defendant had provided the trial court with sufficient information, joinder of the offenses for trial did not constitute an abuse of discretion. Pursuant to Crim.R. 8(A):

"[T]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are a part of a course of criminal conduct."

"The law favors joining multiple criminal offenses in a single trial under Crim.R. 8(A)." *State v. Lott,* 51 Ohio St.3d at 163, 555 N.E.2d at 298; see, also, *State v. Torres,* 66 Ohio St.2d at 343, 20 O.O.3d at 314–315, 421 N.E.2d at 1290–1291. An accused may move to sever under Crim.R. 14 if he or she can establish prejudice to his or her rights. *State v. Lott,* 51 Ohio St.3d at 163, 555 N.E.2d at 298; *State v. Wiles* (1991), 59 Ohio St.3d 71, 76, 571 N.E.2d 97, 107–108.

"The prosecutor may counter the claim of prejudice in two ways. The first is the 'other acts' test, where the state can argue that it could have introduced evidence of one offense in the trial of the other, severed offense under the 'other acts' portion of Evid.R. 404(B). The second is the 'joinder' test, where the state

---

1. This court notes that, in fact, the tape recordings presented into evidence terminated in December 1996. The murder occurred in November 1997. While defendant has argued on appeal that the time period was too lengthy to establish a nexus between the crimes, this court may consider only that which the trial court had before it at the time the motion was made, and at that point defendant informed the trial court that the span of time was "days" and not months.

is merely required to show that evidence of each of the crimes joined at trial is simple and direct. If the state can meet the joinder test, it need not meet the stricter 'other acts' test. Thus, an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." (Citations omitted.) *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, 6.

██ The trial court did not err in refusing to sever the charges because the evidence would have been admissible under the "other acts" provisions of Evid.R. 404(B), which states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state alleged at trial that one of defendant's motives for killing Margo was that her murder was the final culmination of a history of jealousy, possessiveness, and control over her. The state used the fact that defendant was taping Margo's phone calls to illustrate the attempt at control and thus as further proof of one of his motives in killing her. Therefore, the evidence would have been allowed in under Evid.R. 404(B) as evidence of motive. Because the evidence would have been admitted under Evid.R. 404(B), this negates the defendant's claims of prejudice.

Under the joinder test set forth in *Franklin*, the state could further negate the claim of prejudice suffered by defendant through joinder. The Supreme Court of Ohio has noted that "when simple and direct evidence exists, an accused is not prejudiced by joinder." *State v. Lott*, 51 Ohio St.3d at 163, 555 N.E.2d at 298. The essential problem associated with joinder is not found to be present when "the evidence relative to the various charges is direct and uncomplicated, so that the jury is believed capable of segregating the proof on each charge." *State v. Roberts* (1980), 62 Ohio St.2d 170, 175, 16 O.O.3d 201, 204, 405 N.E.2d 247, 251, citing *Drew v. United States* (C.A.D.C.1964), 331 F.2d 85, 88.

The elements of the crimes of interception of wire, oral, or electronic communications, possession of criminal tools, and aggravated murder are wholly distinct and different from each other. It is beyond credibility to think that the jury would have so confused the evidence related to the crimes as to cumulate the evidence against defendant and convict him of crimes not fully supported by the evidence. Therefore, because the state also met the "joinder test," any prejudice claimed by defendant was negated.

Because defendant has not affirmatively established that he was prejudiced or that he provided the trial court with sufficient information upon which to consider the motion for severance, defendant has failed to show that the trial court erred. Defendant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

"The trial judge erred by not granting a change of venue."

In his second assignment of error, defendant has argued that the trial court erred by failing to grant his motion for a change in venue. Defendant has alleged that due to pervasive media coverage of this case and trial, he was denied a fair trial. We disagree.

■ A trial court can change venue "when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18(B). However, " '[a] change of venue rests largely in the discretion of the trial court, and * * * appellate courts should not disturb the trial court's [venue] ruling * * * unless it is clearly shown that the trial court had abused its discretion.' " *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 388–389, 473 N.E.2d 768, 780, quoting *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 243, 289 N.E.2d 352, 355. " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " (Alteration and emphasis *sic.*) *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 722, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051; see, also, *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313– 314; *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

■ Defendant has failed to provide this court with a transcript of the voir dire proceedings in which the trial court questioned the potential jurors about the information they had been exposed to in regard to this case. "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, 15 O.O.3d 218, 220, 400 N.E.2d 384, 385. Therefore, in the absence of a complete transcript of the voir dire proceedings, we are compelled to presume that the trial court completed a careful and searching voir dire of the potential jurors and determined that defendant would not be denied a fair and impartial trial in this venue due to any pretrial publicity. Defendant's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"The trial judge erred by excluding black jurors from the venire upon the State's peremptory challenge over defense counsel's *Batson* objection in violation of [defendant's] constitutional right to a fair trial, to a jury of his peers, and to due process and equal protection under the law."

In his third assignment of error, defendant contends that the state peremptorily excused the only potential African–American juror on the basis of his race and thus denied defendant equal protection under the law. We disagree.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court recognized that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges as to exclude members of minority groups from service on petit juries. *Id.* at 89, 106 S.Ct. at 1719, 90 L.Ed.2d at 82–83; see, also, *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, 589 N.E.2d 1310, 1312–1313. Following *Batson*, a three-step burden-shifting procedure was established to determine if the peremptory challenge is race-based.

First, defendant, as the opponent of the strike, must establish a prima-facie showing that the state purposefully discriminated in exercising a peremptory challenge to remove a prospective juror. To make a prima-facie case of purposeful discrimination, defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged and (2) that the facts and any other relevant circumstances raise an inference that the state used the peremptory challenges to exclude jurors on account of their race. *State v. Hill* (1995), 73 Ohio St.3d 433, 444–445, 653 N.E.2d 271, 281–282.

If the defendant makes a prima-facie case of discrimination, the burden then shifts to the state to provide a race-neutral explanation. *Id.* at 445, 653 N.E.2d at 282. The neutral reason given by the state need not rise to the level justifying exercise of a challenge for cause. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. In fact, the United States Supreme Court has held that "[t]he second step of this process does not demand an explanation that is persuasive or even plausible. ' * * * Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem* (1995), 514 U.S. 765, 767–768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839, quoting *Hernandez v. New York* (1991), 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (plurality opinion).

Finally, the trial court must determine whether the neutral explanation offered by the state is credible or is instead a "pretext" for unconstitutional discrimination. *Hernandez v. New York*, 500 U.S. at 363, 111 S.Ct. at 1868, 114

L.Ed.2d at 408.  The United States Supreme Court noted in *Hernandez v. New York*, "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.  There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409.  Because the findings of the trial court largely turn upon the trial court's evaluation of credibility, reviewing courts should give the determinations of the trial court great deference.  *Id.* Therefore, a trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous.  *Id.* at 369, 111 S.Ct. at 1871–1872, 114 L.Ed.2d at 412;  see, also, *State v. Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d 1310.

■ At the outset, this court notes that the trial court does not appear to have made a determination that defendant established a prima-facie case of discrimination.  However, as noted in *Hernandez v. New York*, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  We thus proceed to an evaluation of the race-neutral reasons proffered by the state in defense of its challenge.[2]

■ The state noted that there were two items of concern that became apparent during the voir dire examination of the juror challenged.  First, the state indicated that the potential juror had specifically stated that he had previously been involved with the police.  Second, the state indicated concern over the fact that the juror informed the trial court that he had personal information about the case from his parents and other people in his neighborhood and not just information from the media.  We agree with the trial court that neither of these reasons denied defendant equal protection.  Therefore, we proceed with step three of the *Batson* inquiry.

■ Pursuant to the third step enunciated by the United States Supreme Court, following the state's proffer of a race-neutral reason, the trial court must determine whether the reasons given were a mere pretext for an unconstitutional strike.  Defendant failed to offer any evidence to indicate that these reasons were

---

2.  This court notes that while defendant failed to include a complete transcript of the voir dire proceedings, defendant did include the portion of the transcript during which defendant objected to the state's peremptory challenge of the only potential African–American juror. That portion of the transcript contains defendant's full objection, the state's race-neutral reasons for the challenge, and the trial court's ruling on the objection.

merely pretextual. As noted by the Supreme Court of Ohio, "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *State v. Gowdy* (2000), 88 Ohio St.3d 387, 393, 727 N.E.2d 579, 585, citing *Purkett v. Elem*, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. Additionally, as the trial court had the opportunity to personally view the demeanor of the attorneys, this court gives great deference to the trial court's determinations of credibility. Because the trial court's overruling of defendant's motion was not clearly erroneous, we find no abuse of discretion in allowing the state to exercise a peremptory challenge for this juror. Defendant's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

"The trial judge erred by denying Defendant's motion in limine for witness statements irrelevant and inadmissible and by admitting 'state of mind' witnesses to offer hearsay testimony in violation of Evidence Rules 402, 403, and 404(B)."

In his fourth assignment of error, defendant appears actually to assert two separate assignments of error. In the first part, defendant has asserted that the trial court erred by overruling his motion *in limine*. In the second part of his assignment of error, defendant has argued that the trial court erred by admitting improper hearsay statements. This court will address each area of this assignment of error separately.

### I. Motion *in Limine*

In his motion *in limine*, defendant sought to have excluded potential witness statements pertaining to defendant's character that were irrelevant and thus inadmissible pursuant to the Ohio Rules of Evidence. The Supreme Court of Ohio has affirmed that " '[a]n order granting or denying a motion *in limine* is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated. An appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial.' " *State v. Grubb* (1986), 28 Ohio St.3d 199, 203, 28 OBR 285, 289, 503 N.E.2d 142, 146–147, quoting *State v. Leslie* (1984), 14 Ohio App.3d 343, 344, 471 N.E.2d 503.

When the alleged character evidence was presented at trial, defendant failed to raise any objection to its use as character evidence. Therefore, this court need not evaluate the propriety of the admission of these statements.

### II. Hearsay

A trial court enjoys broad discretion in determining the admissibility of evidence and its decision should not be reversed absent an abuse of discretion

that has caused the defendant to suffer material prejudice. *State v. Davis* (Aug. 21, 1991), Medina App. No.1952, unreported, at 3, 1991 WL 161353, citing *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 302, 224 N.E.2d 126, 130. As a general rule, out-of-court statements offered to prove the truth of the matter asserted are hearsay and are not admissible. Evid.R. 801(C) and 802.

Defendant has alleged that the trial court erred in the admission of evidence at trial in two basic areas. First, defendant has alleged that the trial court erred by permitting the tapes of the conversations between Margo and various witnesses to be played at trial. Second, defendant has argued that seven witnesses made statements during the course of the trial that constituted impermissible hearsay. This court will address each area separately.

### A. Statements on the Tapes

Defendant has argued that the statements made by Margo on the tapes constituted hearsay and should have been excluded. Defendant has further argued that due to Margo's inability to be cross-examined, he was prejudiced by the admission of her statements through the tapes. Defendant did not raise an objection to the playing of the tapes at trial. Because defendant did not object or raise these issues in the trial court the plain error standard of review of Crim.R. 52(B) is applicable to our consideration. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. In order for this court to apply Crim.R. 52(B), it must be clear that the outcome of the trial would have been different but for the alleged error. See *State v. Lane* (1995), 108 Ohio App.3d 477, 482, 671 N.E.2d 272, 275–276.

A statement constitutes hearsay if it is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). In this case, the tapes were not played to prove that the statements made by defendant, Margo, and other witnesses were in fact true. The tapes were played to prove the necessary elements of the crime of illegal interception of a wire, oral, or electronic communication. Additionally, the whole of the statements was played in order to prove that none of the parties speaking during these communications gave or would have given permission for the taping of the various conversations. Therefore, since the statements on the tapes were played to prove merely that the conversations were illegally taped and not to prove the truth of the content of the conversations, the statements did not constitute hearsay and thus were properly admitted. Because the statements were properly admitted, there exists no plain error.

## B. Witness Statements

Defendant has also argued that certain statements made during the course of the trial were improperly admitted hearsay. Defendant contends that the cumulative effect of these statements taken as a whole served to deprive him of a fair trial. Each statement that defendant has identified as improper will be addressed separately. This court will then address the cumulative effect of those deemed to have been improperly admitted.

First, defendant has argued that the statement of Brenda Weeks, a friend of Margo, was improperly admitted hearsay. Following questioning as to why Weeks encouraged Margo to come and stay with her, Weeks testified that "things were thrown. And one of the biggest reasons was Sahara was smacked in the face and [Margo] was very upset about it. And [Margo] was shoved."[3] While defendant has labeled this statement to be hearsay, it does not properly meet the definition of hearsay. While this statement does constitute an out-of-court statement made by Margo, this statement was not offered to prove the facts contained within the statement. Rather, the state elicited this statement from the witness as an explanation of the actions she took with regard to trying to convince Margo to leave her home and take the girls to stay with Weeks. Therefore, because the statement was not offered for its truth but rather was offered to explain the actions of Weeks, it was properly admitted. *State v. Maurer*, 15 Ohio St.3d at 262, 15 OBR at 398–399, 473 N.E.2d at 789–790.

The second area of testimony defendant assigns as error concerns that in which Annalisa Williams, Margo's attorney, testified as to the process of the divorce proceedings and related an incident that took place in her office. While testifying about the incident that she witnessed between defendant and the victim, Williams recounted defendant's demeanor, tone of voice, and statements that defendant made about Margo. Specifically, she testified that defendant called the victim a "slut."

Pursuant to the Ohio Rules of Evidence, Williams may properly recount that which she personally observed as it relates to defendant's emotional state with regard to the divorce and separation proceedings. The state indicated that the circumstances underlying the divorce were a component of defendant's motive for murder. It was thus critical that the jury understood what those components were and understood that while this marriage terminated in an uncontested divorce, there were significant, hostile proceedings that preceded the divorce decree.

---

3. Sahara and Kenya Prade are the daughters of defendant and Margo.

■ With regard to the statements made by defendant, a recounting of the slurs hurled at and about Margo was properly admitted because it met the definition of statements defined by the Ohio Rules of Evidence as nonhearsay. Specifically, defendants statements were admissions by a party-opponent as defined in Evid.R. 801(D)(2)(a). Evid.R. 801(D)(2)(a) states, "A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * his own statement." As set forth in Evid.R. 801(D)(2)(a), any statement of a party is admissible at trial provided that it is offered against the . party. *State v. Thompson* (1993), 87 Ohio App.3d 570, 577, 622 N.E.2d 735, 739–740. Thus, since the statements were those of the defendant and were being offered against him at trial, the statements were not hearsay and were properly admitted.

■ In the third statement, that defendant has pinpointed as error, Donzella Anuskiewicz, a friend of Margo, testified that she had concerns for Margo's safety. Anuskiewicz testified that she was concerned because of three incidents between defendant and Margo in the time leading up to the divorce. One of the incidents she recounted as a foundation for her concern was based upon the victim telling her that defendant "[got] in her face one night or the night before, or something, and he had put his finger on her nose and pushed her head back. And he called her a fat faced bitch and [said] he was going to fuck her up." An otherwise inadmissible hearsay statement may not be offered as a reason behind an individual's emotional state. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 678, 687 N.E.2d 1358, 1368–1369, citing *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, 397–398. While Anuskiewicz was permitted to testify that she was concerned for Margo's safety, she was not permitted to testify as to the reasons for that concern. Therefore, the statement was improperly admitted; the impact of this error will be discussed following an analysis of the propriety of the admission of each of the remaining statements.

■ The fourth statement defendant points to was made by Francis Fowler, Margo's sister, in which she testified that Margo was afraid of defendant and that she had advised Margo to file a report with the police. Fowler further testified that Margo did not take any action against defendant because she did not want him to get in trouble at work. This statement is not properly considered hearsay because it was not offered to prove that defendant would in fact have gotten in trouble at work, but rather was offered to explain why Margo failed to take the advice of her sister. Therefore, the statement was properly admitted.

■ The fifth statement assigned as error was the relation of a conversation Al Strong, a former suitor of Margo, had with her during a trip the two had taken to Atlanta while dating. He indicated that while on the trip, Margo became very upset after a phone conversation with her daughters. He indicated that she was

upset because defendant had told the girls that "he was denouncing the children, and he was going to marry Carla, and her little boy was going to become his family and for them not to be in touch with him anymore." [4] Strong subsequently testified that as a result of the conversation the victim was upset and anxious to get back home. Strong further testified that as a result of this conversation, Margo resolved to take more extreme action with regard to the divorce proceedings, the custody arrangements, and the child support obligations of defendant. It is these actions that Margo took with regard to the divorce that the state alleged served as an impetus behind her murder. This statement is nonhearsay because it was not offered for the truth of the matter asserted, but rather was offered to explain the actions of both Strong and Margo following this phone conversation. Therefore, the statements were properly admissible.

In the sixth statement assigned as improperly admitted testimony, Timothy Holston, Margo's fiancé, testified that just before Margo was murdered, they had taken a trip to Las Vegas together. While on the trip, Margo became upset after a phone call home. He testified that she was upset because she had learned that even though she had changed the locks in her house and installed a security system, defendant had not only entered the house but had also stayed there with their daughters while she was away. Defendant objected to this testimony. The trial court overruled the objection on the basis that it was not offered for the truth of the matter asserted, but rather was offered to show the effect these actions had upon Margo. As stated previously, an otherwise inadmissible hearsay statement may not be offered as a reason behind an individual's emotional state. *Reynolds*, 80 Ohio St.3d at 678, 687 N.E.2d at 1368–1369. Therefore, the statement was not properly admitted for that purpose.

If a correct ruling was made for incorrect reasons, this court will affirm the ruling. See *State ex rel. Carter v. Schotten* (1994), 70 Ohio St.3d 89, 92, 637 N.E.2d 306, 309–310. Following Holston's recounting of Margo's statement, he testified that in light of this information and the impact that it had upon Margo, he gave her certain advice regarding action she should take with regard to defendant. The statement regarding the actions defendant took by impermissibly entering Margo's home was properly admitted as a basis for Holston's recommendations to Margo just before the murder. Therefore, the admission of the sixth statement was not error.

The seventh statement alleged as erroneously admitted was when Joyce Foster, the office manager in Margo's medical office, testified that Margo had previous problems with defendant over her dating other men. She further

---

4. The individual referred to as "Carla" in defendant's statement is Carla Smith, defendant's girlfriend and fellow police officer.

testified that defendant had told Margo, "You fat bitch. You're running around here fucking all these men. You think anybody wants you. Nobody wants your fat ass, but I got something for your ass." As a result of this statement, Foster indicated that Margo was afraid of defendant. As stated previously, the witness may not testify as to the statements that formed the basis for the declarant's emotional state unless they meet an exception to the hearsay rule. See *Reynolds*, 80 Ohio St.3d at 678, 687 N.E.2d at 1368–1369. Because this statement was offered purely as an explanation of Margo's fear of defendant, it was improperly admitted.

While the third and seventh statements noted above were improperly admitted hearsay statements, their admission was harmless error. Pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Accordingly, "[w]here constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph six of the syllabus.

The state presented a myriad of evidence against defendant over the course of a five-week-long trial that included over twenty-two hundred pages of testimony and over two hundred exhibits. As discussed below in this court's analysis of defendant's sixth and seventh assignments of error, even excluding the improperly admitted hearsay statements, the evidence would be sufficient to sustain defendant's convictions. Therefore, any error that occurred in the improper admission of hearsay statements was harmless error. Defendant's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

"The trial judge erred and abused her discretion by sustaining the State's objection to certain testimony by a defense expert witness."

In his fifth assignment of error, defendant has argued that the trial court erred by excluding certain testimony of his expert witness, Dr. Peter Baum, D.D.S., a maxillofacial prosthodontist, and a related exhibit. Defendant has specifically argued that the trial court erred by prohibiting defendant's expert witness from giving testimony indicating that defendant could not have made the bite mark on Margo due to a difference in the size and ratio of the teeth. This court disagrees.

As noted previously, the trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the

decision of the trial court. *State v. Maurer*, 15 Ohio St.3d at 265, 473 N.E.2d at 791–792.

"A party may not predicate error on the exclusion of evidence during the examination in chief unless *two* conditions are met: (1) the exclusion of such evidence must affect a substantial right of the party *and* (2) the substance of the excluded evidence was made known to the court by proffer *or* was apparent from the context within which questions were asked." (Emphasis *sic*.) *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28 OBR 278, 503 N.E.2d 147, syllabus.

At trial, the state never made an objection on the record as to any testimony of defendant's expert witness. Defense counsel did at one point request the opportunity to meet with opposing counsel at a sidebar, but those proceedings are not on the record.[5] At the close of trial, defendant renewed his objection to the exclusion of Dr. Baum's testimony and the exclusion of a posterboard that had never been marked as an exhibit. At that time, defense counsel stated that Dr. Baum's everyday expertise extended to taking bite patterns from patients. At no point did defendant proffer what Dr. Baum's testimony would have been nor did he proffer the posterboard exhibit that had allegedly been excluded. There was no questioning on the record that related in any way to the evidence that defendant alleges Dr. Baum would have given if permitted to testify fully.

Defendant has argued that even if the record was not properly preserved for appeal, this court should still find that the exclusion of the evidence constituted plain error. In support of this argument, defendant has alleged that because this case is essentially a "bite mark" case, any evidence relating to the bite mark suffered by Margo should have been admitted. While defendant has provided this court with a brief overview of what he alleges Dr. Baum's excluded testimony would have been, this court has absolutely no means of determining what Dr. Baum's testimony would have in fact included. Thus, we refuse to engage in speculation and supposition as to what the extent of that testimony might have shown. Because defendant has failed to provide this court with any evidence in the record that would support his allegations, we cannot determine that the exclusion of this evidence was error, plain or otherwise. Defendant's fifth assignment of error is overruled.

---

5. There was only one break in the testimony of defendant's expert witness and that was immediately following a request by defense counsel that the parties meet at sidebar. None of the conversations that took place at that meeting was recorded by the official court reporter. This court presumes that it was during that sidebar that the alleged objection and a subsequent ruling by the trial court excluding the evidence took place. However, because there is no transcript of those proceedings before us, there is no objection by defendant to this exclusion on the record at that time. Even if we were to presume that an objection was made at sidebar, because of the lack of record of the sidebar proceedings, we have no record of a proffer of any evidence by defendant.

## ASSIGNMENT OF ERROR VI

"The jury verdict finding [defendant] guilty of aggravated murder with a firearm specification was against the manifest weight of the evidence."

## ASSIGNMENT OF ERROR VII

"The jury verdict finding [defendant] guilty of aggravated murder was against the sufficiency of the evidence."

In his sixth and seventh assignments of error, defendant has argued that his conviction for aggravated murder with a firearm specification was against the manifest weight of the evidence, and the conviction for aggravated murder was based upon insufficient evidence. This court disagrees.

The function of an appellate court on review is to assess the sufficiency of the evidence "to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. In making this determination, a reviewing court must view the evidence in the light most favorable to the prosecution. *Id.; State v. Feliciano* (1996), 115 Ohio App.3d 646, 652, 685 N.E.2d 1307, 1310–1311.

While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest–weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541, 548–549 (Cook, J., concurring). In making this determination, we do not view the evidence in the light most favorable to the prosecution. Instead, we must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009, 1010–1011.

This action is reserved for the exceptional case where the evidence weighs heavily in favor of the defendant. *Id.* "Because *sufficiency* is required to take a case to the jury, a finding that a conviction is supported by the *weight* of the evidence must necessarily include a finding of sufficiency." (Emphasis *sic.*) *State v. Roberts* (Sept. 17, 1997), Lorain App. No. 96CA006462, unreported, at 4, 1997 WL 600669.

Upon review of the evidence presented at trial, defendant's conviction for aggravated murder with a firearm specification was not against the manifest weight of the evidence and thus was sufficient as a matter of law. Pursuant to

R.C. 2903.01(A), a person is guilty of aggravated murder if he "purposely, and with prior calculation and design, cause[s] the death of another." A three-year mandatory prison term for a firearm specification shall be imposed upon a felony offender where the offender is found guilty of having "a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2929.14(D)(1)(a)(i) and 2941.145. The elements for both of these convictions were conclusively proven at trial.

On November 26, 1997, the day before Thanksgiving, Margo called her office at approximately 8:55 a.m. to notify her staff that she had finished her rounds at the hospital and was on her way to the office. Although her office staff waited for her to arrive, she never made it to work that morning. Margo was shot and killed by an assailant shortly after arriving at her office building and parking her vehicle.

The evidence presented at trial showed that the assailant awaited Margo's arrival in the parking lot. Once she arrived, he then approached Margo's van and gained entry quickly. Testimony was given that the van was programmed to automatically lock all of the doors once the van reached a speed of fifteen miles per hour. To exit the van, the doors did not need to be unlocked but rather could be opened from the inside. However, once the doors had locked, in order for an individual to gain access to the van from the outside that individual either had to have an individual inside the van unlock or open the doors or the individual had to use a key to unlock the doors. Testimony at trial established that defendant had keys to Margo's van.

Once inside the van, the assailant shot Margo six times and bit her once on her arm. The first shot entered the hand/wrist area and then entered the temporal bone behind the ear. The wound to the wrist was described as a defensive wound inflicted while Margo was trying to protect herself from the assailant. The second shot was to the chest area and severely injured the internal organs, particularly the heart. The first wound was potentially fatal while the second wound was definitely fatal. The third wound entered the right chest. Margo was then pulled forward and her medical coat was ripped open, tearing the buttons from the coat, and exposing the left side of her body for the later wounds. The assailant then shot Margo once in the right abdomen and twice in the left chest. All of the bullets found at the scene were fired from the same weapon.

Howard Brooks, a patient of Margo's, was at her office for an appointment on the morning of the murder. He witnessed defendant speeding away from the parking lot on the morning of the murder shortly after 9:00 a.m. Brooks later

identified defendant in a police photo array. He rated the strength of his identification as one hundred percent certain.

Margo's bloody and lifeless body was discovered by one of her employees at approximately 10:25 a.m. when the employee went outside on a break. The employee called for assistance and although several medical professionals, fire personnel, and the police responded to the scene, Margo was already deceased. After it was determined that Margo could not be saved, the area was then secured as a crime scene for investigation.

The detectives who investigated the crime scene indicated that there were no signs of forcible entry into the van. Margo's purse and medical bag were not removed by the assailant, and the contents were all intact following the murder.

As part of the investigation, the police discovered that Rolling Acres Dodge, the business next door to the medical office building where Margo worked, had video surveillance cameras that captured the medical building parking lot in the background. Through the use of the videos obtained from Rolling Acres Dodge, it was established that the murder occurred between 9:10 and 9:12 a.m. The police interviewed employees of Rolling Acres Dodge to determine if anyone had seen anything that would assist in the investigation. An employee of Rolling Acres Dodge testified that he saw and spoke to defendant in the parking lot of Rolling Acres Dodge between 8:00 and 9:00 a.m. on the morning of the murder. The employee stated the strength of his identification was a ten out of ten.

Although the general details of the murder were not broadcast on the police radio or widely disseminated among the officers of the police force, defendant arrived on the scene at 11:09 a.m. after receiving a page from his girlfriend and fellow police officer, Carla Smith. After informing defendant that his ex-wife had been killed, officers took defendant inside and questioned him regarding his whereabouts that morning. Defendant informed the detectives that during the course of the morning he had done some laundry, made a few phone calls to police headquarters, and had gone to the gym at his apartment complex to work out. He stated that he had commenced his workout at 9:30 a.m. and was in the middle of his workout when he received the page from Carla Smith. He stated that he immediately left the gym and drove straight to the crime scene. Defendant lives six minutes away from the medical building where Margo was murdered. Defendant was very calm when interviewed, and the police detective who interviewed him at the crime scene stated that defendant appeared to have just stepped out of the shower. He smelled fresh, there was no odor, there were no sweat stains, and there was no oil on his head. His hands were clean and dry. The detective also noted a scratch on defendant's chin. Margo's mother also testified that she noticed a scratch on defendant's chin on the day of the murder.

While defendant originally told the police officers that he commenced his workout at 9:30 a.m., he later attempted to show as his alibi that he was working out at the time of the murder between 9:10 a.m. and 9:12 a.m. defendant presented the testimony of a young woman who stated that she saw defendant in the workout room on the morning of the murder. She was able to remember that defendant had entered the workout room when she was midway through her workout; however, the witness was not able to affirmatively establish what time her workout commenced. Defendant also indicated that a gentleman came into the workout room during the time that he was there on the morning of the murder. At trial, that gentleman denied having ever seen defendant in the workout room on any date.

Extensive testimony presented at trial showed that defendant was having financial problems following his divorce from Margo. Detective Paul Calvaruso testified that during the course of the investigation, a Bank One deposit slip belonging to defendant was recovered during a search of financial documents hidden at the home of Carla Smith. The slip was dated October 8, 1997, a month and a half before the murder. On the back of the slip, there was a list of handwritten calculations. Those calculations showed a tally of the approximate amounts owed by defendant in October on eight bills. It also showed that total subtracted from $75,000, the amount of Margo Prade's life insurance policy on which defendant was listed as the beneficiary.

The state also presented medical evidence by Dr. Thomas Marshall, a forensic odontologist, regarding the bite mark on Margo. Dr. Marshall noted that there was a single arch impression on Margo's arm and that the top teeth had not penetrated the lab coat and blouse she was wearing with sufficient force to leave an impression. He took castings of the teeth of Margo, defendant, and four other individuals and compared the bite mark on Margo's arm to the castings of the individuals. Dr. Marshall conclusively determined that Margo did not bite herself. He then ruled out any possibility of the other four people making the bite mark left on the victim. Dr. Marshall stated:

"As it applies to [Defendant], I, as with all the other suspects, I tried to eliminate him. As I said before, I try to eliminate the person rather than count them in, and it got—I could not eliminate any one of the marks on this—on these bite marks you'll see five to six marks in the skin that were bruised, and the more I tried—to be very honest with you, I spent more time trying to exclude him at first than I did trying to include him. I just couldn't—I just couldn't exclude him. Every mark lined up with every other mark. The reason for a mark being less bruised or more bruised in the bite mark on Margo was substantiated by what I saw in these pictures and in the models of—of [defendant]."

Dr. Marshall went on to state, "My conclusion [is] that the bite found on Margo Prade was made by [defendant]."

Defendant presented testimony at trial by his dental expert, Dr. Baum, who indicated that defendant has a diminished ability to bite down. However, Dr. Baum acknowledged that a person's ability to bite as illustrated through, bite mark exemplars is dependent upon the person's cooperation in the process. He further acknowledged that adrenaline can affect an individual's ability to bite down and the amount of force that person can exert.

Defendant also presented testimony to indicate that he could not have been the shooter because the shooter was right-handed and he is left-handed. Dr. William A. Cox, a pathologist, opined that the angle of the entrance and exit wounds in conjunction with the parties' respective positions within the vehicle made it likely that the shooter used his right hand. Dr. Cox further stated that a shooter frequently uses his dominant hand in an attack. Defendant then testified that his dominant hand is his left hand. However, on rebuttal the state presented testimony that showed that all Akron Police Officers are required to qualify in firearm proficiency once a year using both their dominant and nondominant hands.

Defendant has argued that the lack of DNA evidence placing him at the scene is sufficient when countered against the other evidence presented to render his conviction against the manifest weight of the evidence. We disagree. As shown above, Margo was brutally killed by an assailant who appeared motivated only to kill her as shown by his lying in wait for her arrival and by the fact that nothing of value was removed from Margo after the shooting. The state presented testimony that defendant had motive to kill Margo due to financial and personal problems. Defendant was observed at the scene of the crime immediately before and after the murder took place by two separate eyewitnesses. The testimony at trial showed that defendant was proficient in shooting with both of his hands. Finally, Dr. Marshall established that the bite mark left on Margo was made by defendant. Upon review of all of the testimony presented at trial, the conviction for aggravated murder with a firearm specification is not against the manifest weight of the evidence. Therefore, as a matter of law the conviction for aggravated murder is supported by sufficient evidence. Defendant's sixth and seventh assignments of error are without merit.

Defendant's seven assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

BAIRD, P.J., and BATCHELDER, J., concur.