OPINION
{¶ 1} Defendant-Appellant, Shannon Dunn Brown, appeals a judgment of conviction and sentence entered by the Marion County Common Pleas Court upon a jury verdict where she was found guilty of murdering her boyfriend, Jeremy Holsinger. Brown argues that evidence of her threats, violence, and other obsessive behavior in the months preceding Holsinger's death was inadmissible at trial. However, this evidence was probative of her motive or intent and tended to negate claims that the death was accidental or that she possessed a bona fide belief that she was in imminent danger of great bodily harm. Brown further contends that, despite the lack of a request or objection, the trial court erred in failing to provide a limiting instruction as to other acts evidence. Having reviewed the manner in which the evidence was presented at trial, we cannot find that the failure to instruct was an obvious or outcome determinative defect in the proceedings. Because the remainder of Brown's assignments of error are without merit, we affirm the trial court's judgment.
 {¶ 2} Facts and procedural history relevant to issues raised on appeal are as follows: Shannon Brown and Jeremy Holsinger began dating in late 1999, and thereafter went through varying periods of separation and reconciliation. During periods of reconciliation, Brown and Holsinger cohabited. In May 2001, the couple had taken up residence in Marion, Ohio with Sam Toland, Holsinger's cousin, Lana Manley, Toland's girlfriend, and Ray Osborne, a mutual friend. Brown and Holsinger occupied a garage apartment behind the house but were preparing to move to a new residence in southern Ohio with Toland and Manley during the weekend of May 25-27, 2001.
 {¶ 3} Sometime after 11 p.m. on May 24, 2001, Brown, Holsinger, and Toland went next door to Eric Keller's house to drink alcoholic beverages and socialize. Brown testified that she consumed approximately twelve beers between 9 p.m. and 2 a.m. Toland testified that Holsinger may have partially consumed one alcoholic beverage while at Eric's but ceased drinking thereafter. Brown, Holsinger, and Toland returned home sometime around 2 a.m. Osborne was already sleeping in his downstairs bedroom. Manley, however, remained awake.
 {¶ 4} Manley testified that she, Brown, Holsinger, and Toland stood around talking in the kitchen for a period of time before she and Toland retired upstairs to their bedroom around 3:30 a.m. Manley indicated that as she was heading upstairs, Brown and Holsinger were laughing and preparing to watch a movie in the living room where, due to the cold weather, they planned to sleep that evening.
 {¶ 5} At approximately 4:30 a.m., Toland and Manley awoke to Holsinger falling upon their bed and Brown screaming, "Call 9-1-1!" Pursuant to Toland's instructions, Manley ran downstairs to place the call but was unable to locate either of the residence's two phones. She was eventually able to locate a phone under a chair in the living room and dialed 9-1-1. The other phone was found smashed in an alley behind the house later that day. Brown can be heard upon the 9-1-1 tape informing Manley that she and Holsinger had fought, he struck her, and she accidentally stabbed him.
 {¶ 6} Shortly thereafter, police and emergency response services arrived. Holsinger was transported to a local hospital where he underwent surgery for his injury. Brown was arrested for felonious assault and taken into custody. She subsequently waived her Miranda rights and submitted to two taped interviews wherein she maintained that she grabbed the knife in self-defense and that the stabbing was accidental. Holsinger's surgery was unsuccessful, and he was pronounced dead at 8:27 a.m.
 {¶ 7} On June 7, 2001, the Marion County Grand Jury indicted Brown on one count of involuntary manslaughter, in violation of R.C. 2903.04(A). Thereafter, the indictment was amended to include charges of murder, in violation of R.C. 2903.02(B), involuntary manslaughter, in violation of R.C. 2903.04(B), and felonious assault, in violation of R.C. 2903.11(A)(2). Brown pled not guilty to all charges. The state subsequently elected to proceed solely upon the murder charge, and the matter proceeded to trial on December 17, 2001.
 {¶ 8} On December 20, 2001, the jury found Brown guilty of murder. She was subsequently sentenced to an indefinite prison term of fifteen years to life. The instant appeal followed, with Brown presenting five assignments of error for our review.
First Assignment of Error
 {¶ 9} "The Trial Court committed prejudicial error by denying Appellant's Motion in Limine to preclude Appellee from presenting evidence of Appellant's prior bad acts."
 {¶ 10} In her first assignment of error, Brown claims that the trial court erred in admitting evidence of prior acts of violence and threats directed toward the victim and his former paramours. She argues that the only plausible use for this evidence was to draw impermissible character inferences, claiming that her conduct throughout these events was too far removed from the incident at issue and merely illustrates a predilection for violence. In response, the state maintains that the evidence was admissible to establish motive and intent and to disprove her claims that the stabbing was accidental.
 {¶ 11} As a preliminary matter, we must determine whether Brown preserved her claimed errors for review. Prior to trial, Brown moved in limine to exclude evidence of other acts and threats toward the victim and his former girlfriends. The trial court denied the motion, advising her to renew the objection at trial. Thereafter, the state proceeded to call Lana Manley, Sam Toland, Ray Osborn, and Jessie Howard to testify to the events surrounding Holsinger's death and previous incidents in which Brown reacted violently toward or threatened him or his former paramours. Brown failed to lodge an objection during this testimony. Instead, after these witnesses had completed their testimony and left the stand, she attempted to renew her motion as to evidence of other threats and argued the evidence was cumulative. At that point, the trial court denied the motion, the proceedings resumed, and the state presented nine more witnesses who corroborated this testimony or testified to similar conduct.
 {¶ 12} Although a motion in limine is a useful technique for raising issues of evidentiary admissibility prior to trial, a ruling thereon is merely tentative, and the denial of a motion in limine does not preserve error for purposes of appeal, absent a proper objection at trial.[1] [Therefore, "in order to preserve supposed error from an anticipatory order in limine, the complaining party must raise the evidentiary issue on the record at the place in the trial that the foundation and context have actually been developed. * * * If counsel opposes the reception of an adverse party's evidence, he must object when the evidence is actually presented, or he may well have waived any objection to the denial of his earlier motion in limine."[2] While a subsequent ruling contemporaneous to the submission of the evidence at trial may be sufficient to preserve an alleged error for review on appeal, the renewal must come before or at the time the evidence is presented.[3] To permit one to retroactively preserve errors after several witnesses have completed their testimony without objection contravenes the volume of authority on preservation of errors. Therefore, while Brown's general objection at best preserved error as to Jessie Howard and the witnesses that followed, she waived any error, save plain error, in the admission of the testimony and evidence presented by the first four witnesses. Mindful of this and the limited scope of the objection, we proceed to examine the contested evidence under the circumstances presented herein.
 {¶ 13} Brown was prosecuted under the theory that she was a "time bomb" and that Holsinger's death was the final culmination of a violent relationship characterized by her obsessive jealously, possessiveness, and aggressive attempts to control him. This theory was pursued from two perspectives. First, the State challenged her recitation of events preceding the stabbing, attempting to refute her passive characterization of her role in the incident and contentions that Holsinger was the violent aggressor, and to establish that the argument that evening over her alleged flirtation with the neighbor had prompted a violent response precipitated by her inability to control him or the potential breakdown of the relationship. In support of this theory, the state speculated that Holsinger had decided to leave her as a result of the argument and presented evidence that his bags were found packed the morning after the incident. Alternatively, it was argued that even assuming Brown's depiction of the events leading up to the stabbing to be true, her voluntary act of swinging or thrusting the knife was not mere posturing, motivated out of fear and intended to dissuade Holsinger's pursuit of her, but was conduct prompted by an awareness or desire that her actions would inflict physical harm upon him.
 {¶ 14} To refute Brown's contentions that the stabbing was accidental or necessary to defend herself from imminent danger of great bodily harm or death, establish a motive for her conduct, and show that she either intended or possessed an awareness of the result, the state introduced testimony and evidence demonstrating the instability and volatility of their relationship, her obsessive possessiveness, and the course of events leading up to the night in question. Specifically, the state presented the following testimony concerning threats issued by Brown against Holsinger and his girlfriends:
 {¶ 15} Ray Osborne testified that in speaking with Brown after a May 2001 dispute, she told him that "[i]f she couldn't have Jeremy, no other bitch could have him," and, "[i]f Jeremy would ever leave she would do something, and I don't know what she meant by it."
 {¶ 16} Jeri Toland, whom Jeremy had dated in November 2000 and January 2001, testified that as she and Holsinger were watching television in her apartment, Brown came over to confront Jeremy about their relationship and "* * * was yelling saying she was going to beat us up and kill him, kill Jeremy and stuff like that." Sam Toland testified that Brown admitted to him that she yelled that she was going to kill Holsinger. Lana Manley also testified that Brown conceded to her that she broke a window in an effort to get inside and "beat Jeri up." In contrast, Brown denied having threatened anyone's life or made any attempts to enter the residence.
 {¶ 17} Melissa Breidenstein, Brown's cousin, dated Holsinger when he was estranged from Brown in April 2001. Breidenstein testified that the first day Brown found out about the relationship she "[t]old me that she was going to stomp my brains in and that I'd better have the police and ambulance waiting for me because they wasn't going to be able to identify my body when she was done with me. And she said that if she couldn't have Jeremy, nobody could." Lana Manley testified that when Brown found out that Breidenstein had been over to his residence in April, she told her to inform Breidenstein that "when she catches her out she's going to beat her up real bad." Jessie Howard, Holsinger's cousin, was present when Brown came to confront Holsinger regarding Breidenstein's presence at the residence. Howard testified that Brown informed him that she was going to beat Holsinger up for being with Breidenstein and stated that if she could not have him, nobody could. Breidenstein testified that Brown threatened her with violence on at least ten occasions, indicating that she had reported to the police that her life had been threatened and had broken up with him because she was terrified and didn't want to continue going out with him if she was going to have her life threatened.
 {¶ 18} Lori Hummel, Brown's neighbor in April 2001, testified that when she inquired as to Holsinger's whereabouts after a prolonged absence, Brown responded that she did not know his whereabouts and informed her that she had spray-painted his clothes and was going to "beat the `F' out of him" because he had stolen her checkbook and a J.C. Penny's gift card. Brown initially denied the story but subsequently admitted to the incident.
 {¶ 19} Kira Holcomb, who also dated Holsinger in the months preceding his death, testified that Brown would call and threaten to "beat" or "rip her ass," and that "if I didn't stay away from Jeremy she was going to kill me." Jessie Howard confirmed that he had heard threats Brown left for Kira on her voice mail wherein she stated: "Kira, this is Shannon. When you get this message, if I was you I wouldn't be out running the streets because as soon as I find you I'm gonna thump your head and you'd better crawl underneath a rock and die." Lindsay Tinnerello reported that she participated in a three-way phone conversation wherein Brown told Holcomb that if she did not stay away from Holsinger she would kill them both. Tinnerello further testified that around the preceding Christmas she heard Brown tell Holsinger that she would kill him if he ever broke up with her.
 {¶ 20} Homer Young, Holsinger's uncle, and Holsinger's grandmother testified that in the month preceding Holsinger's death, Brown had stormed into his grandmother's house and immediately instructed him to "[s]hut your fucking mouth or I'll kill you," subsequently stating that "[i]f I can't have you Jeremy no one will." Brown initially denied this, recanted, and then indicated that all of the other witnesses were lying because they were family or were sleeping with the Holsinger family.
 {¶ 21} It is well established that evidentiary rulings are within the trial court's broad discretion and will be the basis for reversal only on an abuse of discretion that amounts to prejudicial error.[4]
"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."[5]
 {¶ 22} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B) permits other acts evidence in a criminal proceeding if: (1) substantial proof is adduced to show that the person against whom the evidence is offered committed the other acts; (2) one of the matters enumerated in the rule or the statute is a material issue at trial, and; (3) the evidence tends to prove the material enumerated matter.[6]
 {¶ 23} Similarly, R.C. 2945.59 provides that evidence of other acts may be admissible "[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant." Because the statute is in derogation of the common-law prohibition against other acts evidence, it is strictly construed against the State.[7] Therefore, "[e]vidence of other acts of a criminal defendant is admissible, pursuant to R.C. 2945.59, only if one or more of the matters enumerated in the statute is a material issue at trial and only if such evidence tends to show the material enumerated matter."[8]
 {¶ 24} As noted by the Ohio Supreme Court, "[s]ince it is assumed that human conduct is prompted by a desire to achieve a specific result, the question of motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction."[9] An individual with a motive is more likely to commit a crime than someone lacking a reason for the conduct. Where, as here, the motive behind an individual's alleged attack upon another human being with a deadly weapon is not apparent, such evidence is relevant and admissible to prove that the individual's conduct was prompted by a desire to achieve a specific result.[10]
 {¶ 25} In addition, other acts evidence may be admissible under the parameters of Evid.R. 404(B) to establish intent, even where intent is not disputed at trial.[11] "[W]here the defendant specifically places his particularized intent to commit the charged crime in issue, either by directly denying such intent or by asserting accident or mistake, is it material (and therefore admissible) to introduce otherwise relevant evidence of other acts of a similar nature as probative of the issue."[12] "When the purpose of evidence of other acts is to show the absence of mistake or accident on the part of the defendant in committing the offense charged, it must be shown that a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of a similar nature. The other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question. The evidence is then admissible to the extent it may be relevant in showing the defendant acted in the absence of mistake or accident."[13]
 {¶ 26} The state was required to prove, beyond a reasonable doubt, that Brown was aware that her conduct would probably cause physical harm to another by means of a deadly weapon.[14] Because Brown asserted that Holsinger was the aggressor, that she yielded the knife in self defense, and that in doing so she had no intention of injuring or killing him, there existed a genuine dispute supporting the introduction of other acts evidence to establish mens rea, i.e., whether she acted out of fear with the intent of merely threatening Holsinger or whether her conduct was indicative of an awareness, motivation, or desire to inflict physical harm upon him. Moreover, as discussed in our review of Brown's fifth assignment of error, this evidence was relevant to whether she possessed a bona fide belief that she was in imminent danger of great bodily harm and that her only means of escape was the use of such force.
 {¶ 27} As outlined above, the State contends that Brown's motive in yielding the knife was driven in part by her inability to deal with his rejection of her or her perceived loss of control over the relationship. The nature of their relationship bore directly on whether she had a motive to harm him or acted knowing that her actions would cause physical harm.[15] It is well established that evidence of a defendant's threats, violence, or other obsessive behavior in the months preceding a murder is probative of the defendant's motive or intent and tends to negate claims that the death was accidental.[16] In State v.Newcomb, we held that evidence indicating that the murder was the final culmination of the defendant's possessive control and testimony describing conflicts predicated upon his jealousy and violent reactions to the victim's alleged relationships with other men, was admissible proof of the defendant's motive and why he would have a desire to kill her.[17]
 {¶ 28} One could reasonably conclude, based upon circumstances surrounding the incident, that the argument that night over her alleged flirtation with another man prompted a violent response to a perceived loss of control over the relationship. Therefore, testimony describing prior threats and acts of violence predicated upon her jealousy, possessiveness, and need to control him tends to undermine her passive portrayal of her role in the altercation and supports the conclusion that the act of swinging or thrusting the knife was conduct prompted by an awareness or desire that her actions would inflict physical harm upon him.[18] The incidents admitted were similar because they all started with an argument or breakdown of the relationship and ended with Brown delivering threats or acts of violence. Contrary to Brown's assertions, her conduct throughout these incidents evidences more than a mere general propensity for violence, illustrating a "situationally specific" emotion and rationale for her conduct on the night in question.[19] Although Brown argues that this evidence was not identical to or inextricably related to the act in question, both R.C. 2945.59 and Evid.R. 404(B) contemplate and permit the introduction of acts which are not similar to the crime at issue.[20] "The requirement of a `temporal, modal, and situational relationship' between a prior act of the defendant and the crime charged does not mean that the two must be identical. This requirement merely represents the `common sense conclusion that an act too distant in time or too removed in method or type has no permissible probative value to the charged crime.'"[21]
 {¶ 29} Furthermore, as mentioned above, Brown failed to object to extensive testimony from several witnesses regarding threats and specific instances of conduct. Significant portions of the testimony admitted after the renewal of the motion in limine related to the same events and merely provided a factual background for the otherwise unchallenged testimony. Although this was objected to as cumulative, Evid.R. 404 requires that "substantial proof [be] adduced to show that the person against whom the evidence is offered committed the other acts." Brown's denial that several of the incidents occurred and conflicting versions of other incidents exacerbated the need for and justified the presentation of multiple witnesses to prove that she committed those acts. Therefore, we do not find that the trial court abused its discretion in admitting this evidence.
 {¶ 30} Accordingly, Brown's first assignment of error is overruled.
Second Assignment of Error
 {¶ 31} "The Trial Court committed plain error by failing to instruct the jury that any alleged prior wrongs or acts of Appellant should only be considered for a limited purpose."
 {¶ 32} In her second assignment of error, Brown asserts that despite her failure to object to or request a limiting instruction on other act evidence, her motion in limine and subsequent renewal thereof placed the trial court on notice of the issues surrounding the admission of such evidence and the need for a corresponding jury instruction. She claims that the outcome of the trial would clearly have been otherwise if the trial court had issued the instruction. The State argues that there is no reason to believe that an appropriate instruction would have been outcome determinative.
 {¶ 33} In State v. Davis, the Ohio Supreme Court held meritless the appellant's argument that the trial court erred in failing to provide a limiting instruction to the jury regarding the `other acts' evidence.[22] In doing so, the Court stated: "Crim.R. 30(A) provides in relevant part: `A party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.' Having failed to request a limiting instruction, appellant has waived this issue for purposes of appeal."[23]
 {¶ 34} Similarly, Brown failed to request limiting instructions at trial and has thus waived this issue for purposes of appeal, absent plain error.[24] Courts are admonished to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."[25] Having reviewed the manner in which such evidence was presented and argued at trial and considering the dictates of Crim.R. 30 and 52(B), in light of our determination that the challenged evidence was admissible, we cannot find that the failure to instruct was an obvious or outcome determinative defect in the proceedings. Accordingly, Brown's second assignment of error is overruled.
Third Assignment of Error
 {¶ 35} "The Trial Court erred in failing to grant Appellant's Motion for Judgment of Acquittal."
Fourth Assignment of Error
 {¶ 36} "The jury's verdict of murder was against the manifest weight of the evidence."
 {¶ 37} For her third and fourth assignments of error, Brown argues that "[d]ue to the lack of any eyewitness testimony and the lack of any problems between appellant and the victim [in the] hours before the victim's death, reasonable minds could only have reached the conclusion that appellee failed to prove each material element of murder." The state maintains that Brown's credibility was undermined by substantial physical evidence contradicting her recitation of events, and, even assuming her version of events to be true, it would be incomprehensible to believe that she was unaware that her conduct was likely to cause physical harm or was excusable under the guise of self-defense.
Motion for Acquittal/Sufficiency
 {¶ 38} According to Crim.R. 29(A), "[t]he court on motion of a defendant or on its own motion, after the evidence on either side has closed, shall order the entry of acquittal of one or more offenses charged in the indictment, information or complaint, if the evidence is insufficient to sustain a conviction of such offenses. * * *." In reviewing a trial court's decision on a motion for acquittal, this Court is bound to follow the standard of review announced in State v.Bridgeman, which provides: "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt."[26]
 {¶ 39} The Bridgeman standard, however, must also be viewed in light of the test for sufficiency of the evidence.[27] This test was set forth in State v. Jenks, wherein the Ohio Supreme Court stated: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[28]
 {¶ 40} In this case, the state sought to convict Brown of murder in violation of R.C. 2903.02, which provides that no person shall cause the death of another as a proximate result of the offender committing or attempting to commit a violent offense that is a felony of the first or second degree. Brown was prosecuted on the premise that she caused Holsinger's death as a result of committing felonious assault in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordinance. "A person acts knowingly, regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."[29] As discussed above, the State pursued the theory that Brown was a "time bomb" and that Holsinger's death was the final culmination of a violent relationship characterized by her aggressive jealously, possessiveness, and obsessive attempts to control him.
 {¶ 41} Brown responded to the charges and has continued to argue on appeal both that she was trying to defend herself when Holsinger was stabbed and that the stabbing was accidental. Under Ohio law, self-defense is an affirmative defense for which an accused must prove the following by a preponderance of the evidence: (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape from such danger was in the use of force; and (3) the accused must not have violated any duty to retreat or to avoid the danger.[30] Further, the "elements of self-defense are cumulative. * * * If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense."[31] In general, the decision whether to seek an instruction on self-defense is usually a matter of trial tactics.[32] However, the defenses of accident and self-defense are generally regarded as mutually exclusive.[33] In Statev. Barnd, we noted that the defenses of accident and self-defense are "inconsistent by definition," as accident involves "the denial of a culpable mental state and is tantamount to the defendant not committing an unlawful act," whereas a defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions."[34] Considering the parties' respective positions, we proceed to outline evidence of the events surrounding Holsinger's death.
 {¶ 42} Brown testified that as they were preparing to watch a movie, Holsinger "started telling me that he knew I didn't want to be there with him, I wanted to be next door with the neighbor." She indicated that when the argument began to escalate, she told him she was not going to argue with him, but was going to go down the street to her mother's house. When she got to the back door in the kitchen and put her hand on the doorknob, Holsinger approached her from behind, grabbed her by the hair, spun her around, and then punched her in the face. Brown stated that she stumbled and fell over the stove as Holsinger told her she was not going anywhere. She then grabbed a knife out of an adjacent butcher's block and turned to find Holsinger returning to the front room. Brown testified that she took the knife only to deter any subsequent pursuit.
 {¶ 43} In her police interview, Brown described the events to follow, stating: "I told him I was leaving. I'm going to my Mom's. And I walked out the back porch. And I can't remember if it was on the porch or right off the back porch, he grabbed me by my hair again and told me I wasn't going nowhere. And when he grabbed me by the hair, I turned around and I, and I just meant to scare him. I didn't mean to hurt him." Throughout the interview she used the phrase "I turned around," repeating at one point that she grabbed the butcher knife, "walked out the back door with it and either on the back porch or in the back yard he grabbed me again. And I turned around and I cut him." She offered the following account at trial: "I was — I got off of the back porch and I was running through the back yard, and Jeremy come out after me and grabbed me by the back of my hair. My hair was in a pony tail and he was pulling me, and I just swung around with the knife like that (Indicating)." Brown admitted that Holsinger had no idea she possessed the knife, and she did not warn him of such prior to turning around. She did not contest and agreed that she thrust the knife into Holsinger, claiming only that she accidentally stabbed him while attempting to defend herself.
 {¶ 44} When asked of her purpose in turning around with the knife, Brown reiterated that she only meant to scare him, did not mean to harm him, and merely wanted him to leave her alone. She denied being upset or angry with him, claiming only to be scared of his advances. When asked whether it would be correct to conclude that "since you claim you weren't trying to stab Jeremy, that you didn't feel like you were in enough danger that you needed to try to use deadly force against Jeremy," Brown responded that she did not know whether she was in danger of receiving great bodily harm. In her second police interview, she indicated that "it just scared me tonight, you know, `cause I had been trying real hard not to, you know, put my hands on him `cause I know, you know, I been in prison and I know what can happen." When asked whether she could have held her own with him that evening, she responded that "I probably could have, but I didn't want to go that, that far."
 {¶ 45} Dr. Walter E. Beasley, the thoracic surgeon who performed emergency surgery on Holsinger, testified that he was admitted with a stab wound above the left clavicle, which appeared to extend in a downward direction toward the chest, indicating that "if the person was vertical it would be toward the floor." He opined that because the wound had entered the chest cavity, damaging blood vessels, collapsing his lung, and filling the cavity with blood, it had to be at least three to five inches deep. Dr. Beasley testified that Holsinger had a slim chance of surviving the wound, characterizing the operation as a "desperation surgery." When asked whether the wound was consistent with a person swinging a knife in a horizontal motion, he responded that "it couldn't have happened without being in a downward motion." He conceded however, that he was unable to tell the parties' respective postures or positions during the event from the nature of the wound.
 {¶ 46} When the police requested that she describe the manner in which she turned and swung the knife, Brown indicated that she made a counter-clockwise turn, swung the knife in a horizontal motion, and believed that she had cut him across the chest. She claimed to have held the knife in a clenched fist with the blade protruding in an upward direction between her thumb and index-finger. When asked as to their relative positions when the injury was inflicted, Brown indicated that they were standing. Confronted with the inconsistencies between the location and characteristics of the wound, the parties' relative heights, their standing position, and the manner in which she claimed to have inflicted the injury, Brown could offer no explanation as to how Holsinger received a downward stab three to five inches into his chest above his right collarbone. On redirect, she qualified her previous testimony as to the parties' relative positions, stating that she was unsure as to their exact posture or her exact motion. She continued, however, to deny having employed an overhand stabbing motion.
 {¶ 47} In addition, Brown admitted to consuming approximately twelve beers that evening, conceding that she thinks less clearly, tends to have a diminished perception as to what she is doing, and may be inclined to make stronger threats when she is intoxicated. Although she asserted that Holsinger was prone to violence and claimed that he had knocked her unconscious, no one had ever seen him hit her or were able to corroborate her testimony, and she was unable to explain why none of his former girlfriends experienced any problems with him being abusive. With respect to evidence concerning the nature of their relationship and her related conduct, Brown would initially deny that certain incidents occurred and then subsequently admit thereto. Her depiction of other events directly contradicted eyewitness testimony or her admissions to others. She further denied having ever threatened anyone's life, recanted, admitted to certain threats, and then indicated that all of the other witnesses were lying.
 {¶ 48} Having examined the evidence admitted at trial in a light most favorable to the prosecution, we find that such evidence, if believed, was sufficient to permit a rational trier of fact to find that the essential elements of the crime had been proven beyond a reasonable doubt. Inconsistent testimony, conflicting versions of events, admitted alcohol-induced perception deprivation, and contradictory evidence raised significant issues as to Brown's credibility. Even assuming a majority of her recitation of events preceding the stabbing to be true, one could reasonably conclude that she voluntarily swung the knife at Holsinger with an awareness or desire that her actions would inflict physical harm upon him, that she did not possess a bona fide belief that she was in imminent danger of death or great bodily harm, and that situation did not warrant deadly force. Accordingly, the trial court did not err in overruling her Crim.R. 29 motion for judgment of acquittal.
Manifest Weight
 {¶ 49} Having addressed Brown's arguments regarding sufficiency, we must turn our attention to her assertion that the convictions were against the manifest weight of the evidence. Though evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' "[35]
In making its determination on this issue, the appellate court: * * * [Reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost itsway and created such a manifest miscarriage of justice that theconviction must be reversed and a new trial ordered.[36] Appellate courts are cautioned to sustain a manifest weight argument in exceptional cases only, where the evidence "weighs heavily against the conviction."[37]
 {¶ 50} The record herein does not support a reversal on this basis. While it is true that the state's case relied in part upon circumstantial evidence and Brown's testimony conflicted with that of other witnesses in several respects, having reviewed the record in its entirety, we cannot say that the trier of fact clearly lost its way in resolving these conflicts in favor of the State or created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Therefore, we find that the conviction is not against the manifest weight of the evidence. Accordingly, Brown's third and fourth assignments of error are herby overruled.
Fifth Assignment of Error
 {¶ 51} "Appellant was denied effective assistance of counsel due to her trial counsel's failure to object to inadmissible character evidence, failure to request a limiting instruction concerning prior extrinsic acts, failure to present evidence concerning Brown's post-traumatic stress disorder and failure to object to the admission of Brown's privileged communications and medical records."
 {¶ 52} For her fifth assignment of error, Brown presents several arguments in support of her proposition that she received ineffective assistance at trial. We proceed to address these arguments in turn.
Standard for Ineffective Assistance Claims
 {¶ 53} As a preliminary matter, we set forth the applicable standard of review. A claim for ineffective assistance of counsel requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result.[38] In asserting an ineffective assistance of counsel claim, the appellant must overcome the presumption that a licensed attorney is competent and that his decisions constitute sound trial strategy.[39] An appellate court reviewing an ineffective assistance of counsel claim will generally not second-guess counsel's strategy in direct and cross-examination of witnesses.[40] Therefore, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different.[41] "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.[42]
 A. Failure to Object to Evidence of Victim's Reputation for Peacefulness.
 {¶ 54} The State elicited testimony as to Holsinger's role in the couple's altercations and his reputation for being a peaceful person. Several witnesses indicated that they believed Holsinger to be a peaceful person and had never seen him strike Brown. Jessie Howard testified that Holsinger did not respond with violence when struck by Brown. Brown argues that the admission of this evidence during the state's case-in-chief and the admission of specific instances of his conduct were clearly objectionable and inadmissible.
 {¶ 55} As a preliminary matter, we note that "[t]he failure to object to questions improperly posed by the prosecution is not [generally] enough to sustain a claim of ineffective assistance of counsel."[43] Nevertheless, Evid.R. 404(A)(2) permits the introduction of "evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor." As outlined above, Brown's defense was that Holsinger was the initial aggressor and that she reacted in self-defense, accidentally stabbing him. Evid.R. 405(A) states that: "In all cases in which evidence of a character or trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion."
 {¶ 56} In addition, although Evid.R. 405(B) has been construed to preclude the introduction of specific instances of conduct to prove that the victim was the initial aggressor,[44] courts have generally admitted testimony by the accused and by corroborating witnesses concerning the victim's reputation for violence and specific instances of violent conduct for the purpose of proving the accused's state of mind at the time of the offense, i.e., whether the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was the use of such force.[45] By claiming that Holsinger's behavior during the incident and her awareness of his prior conduct necessitated that she yield a knife in self-defense, Brown placed his penchant for violence at issue and would have opened the door to the admission of evidence of specific instances of conduct. Although no objection was lodged to the State's introduction of this evidence, this may well have been a tactical decision for which we will not second-guess counsel's strategy. Accordingly, we do not find that there was a reasonable probability that an objection would have changed the result of the trial.
B. Failure to Present Post-Traumatic Stress Disorder Evidence.
 {¶ 57} Brown further avers that her trial counsel's failure to present evidence that she was suffering from post-traumatic stress disorder and was prone to an exaggerated startled response prejudiced her argument of self-defense and prevented the jury from understanding her state of mind during the incident. The State argues that the decision of whether to present the evidence was a matter of trial strategy, asserting that the diagnosis was undermined by inconsistencies in her recitation of events and that issues relating to the foundation of the opinion would open the door to other harmful evidence.
 {¶ 58} At an early stage in the proceedings, defense counsel requested funds for the appointment of an expert to provide a psychological evaluation of Brown. She was subsequently evaluated by Dr. James Sunbury at the District V Forensic Diagnostic Center in Mansfield, Ohio. Dr. Sunbury concluded that Brown was not suffering from battered women syndrome but opined that she was suffering from post-traumatic stress disorder, which produced an exaggerated startle response. After Brown testified, defense counsel requested a recess so that he could talk with Dr. Sunbury and determine whether to present his testimony in her defense.
 {¶ 59} The record does not disclose that Brown's trial counsel neglected to investigate the defense of post-traumatic stress syndrome. Conversely, the record reflects that defense counsel made a tactical decision not to present the evidence. Whether this decision was predicated upon discrepancies in her testimony, foundational issues related to his opinion, or the possibility of introducing damaging evidence, we will not second-guess counsel's strategy. Therefore, we find that Brown has failed to overcome the presumption that her trial counsel was competent and that his decisions constitute sound trial strategy.
C. Failure to Object to Each Specific Other Act; Failure to Request
 A Limiting Instruction as to Other Acts.
 {¶ 60} In light of our disposition of the preceding assignments of error, we cannot find that there is a reasonable probability that an objection to each specific other act or a limiting instruction as to the use thereof would have changed the result of the trial.
E. Failure to Object to Admission of Hospital Records and
 Privileged Communications Related Thereto.
 {¶ 61} Brown also maintains that her trial counsel was ineffective because he permitted the introduction of hospital records and the testimony of a physician's assistant relating to an altercation in the weeks preceding Holsinger's death wherein she sought treatment for a broken hand. She argues on appeal that this evidence contained privileged communications and should have been objected to and excluded under R.C.2317.02.
 {¶ 62} The fact that a patient received medical treatment on a particular day and time and the nature of the injuries for which treatment was sought are not privileged.[46] Moreover, the evidence regarding the reported source of Brown's injury merely reiterated substantial other independent evidence concerning the events and was consistent with her own testimony. Brown informed police in her second interview that she had broken her hand striking Holsinger and admitted to Lana Manley that she had lied to medical service providers when she told them she received the injury while boxing. She further claimed to have been knocked unconscious during the altercation, attempting to employ the incident to buttress her claim to have been in fear of imminent danger of great bodily harm. She was unable however, to corroborate this claim and, as evidenced by her admissions and hospital records, failed to seek treatment for any related injury.
F. Failure to Object to Other Acts Evidence Contained
 in Recorded Statements to Police.
 {¶ 63} The Marion City Police department recorded two statements from Brown the night of the incident, which were subsequently played and admitted without objection before the trial court. During the interview, she recounted altercations with Holsinger, including the fight in which she broke her hand, and spoke about her history of alcohol abuse and the role alcohol played in that evening's events. Deferring to the arguments presented in support of her first assignment of error, Brown argues that this evidence was inadmissible and asserts that she received ineffective assistance due to her trial counsel's failure to object thereto.
 {¶ 64} As discussed previously, the altercation referenced in the interview was admissible for purposes of establishing motive and intent and was relevant to Brown's claim that she reacted in self-defense. Furthermore, her use of alcohol and its effects upon her cognitive ability were relevant to her ability to accurately recall the events of the night in question. Therefore, we cannot find that there is a reasonable probability that an objection to this evidence would have changed the result of the trial.
 {¶ 65} Accordingly, Brown's fifth assignment of error is overruled.
 {¶ 66} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, the judgment of the Marion County Common Pleas Court is hereby affirmed.
Judgment affirmed.
HADLEY, J., concurs.
BRYANT, J., dissents.
[1] State v. Grubb (1986), 28 Ohio St.3d 199, 201.
[2] State v. White (1982), 6 Ohio App.3d 1, 4 (citation omitted).
[3] State v. Maurer (1984), 15 Ohio St.3d 239, 259, fn. 14, citing Palmer, Ohio Rules of Evidence, Rules Manual (1984) at 446; Schurr v.Davies (May 15, 1986), Van Wert App. No. 15-84-23, quoting White,6 Ohio App.3d at 5; see, also Thomas v. Tuway American Group (Jan. 25, 2000), Mercer App. No. 10-99-17; State v. Boyd (Jan. 12, 1995), Cuyahoga App. No. 65883, 12462.
[4] State v. Graham (1979), 58 Ohio St.2d 350, 352.
[5] Evid.R. 103.
[6] See State v. Lowe (1994), 69 Ohio St.3d 527, 530; State v.Curry (1975), 43 Ohio St.2d 66, syllabus.
[7] State v. DeMarco (1987), 31 Ohio St.3d 191, 194.
[8] Curry, 43 Ohio St.2d 66, syllabus.
[9] Id. at 70-71 (citation omitted).
[10] Id. at 71.
[11] State v. Smith (1990), 49 Ohio St.3d 137, 141.
[12] State v. Snowden (1976), 49 Ohio App.2d 7, 12.
[13] State v. Burson (1974), 38 Ohio St.2d 157, 159, citing State v.Moore (1948), 149 Ohio St. 226.
[14] R.C. 2903.02; see, also R.C. 2901.22(B).
[15] State v. Newcomb (Nov. 27, 2001), Logan County App. 8-01-07, dismissed, appeal not allowed by 94 Ohio St.3d 1489; State v. Merchant
(Feb. 19, 1997), Lorain App. No. 96CA006334.
[16] State v. Nields (2001), 93 Ohio St.3d 6, 22; State v. White
(1999), 85 Ohio St.3d 433, 441; State v. Kinley (1995), 72 Ohio St.3d 491; Newcomb, supra; State v. Bruno (Feb. 8, 2001), Cuyahoga App. No. CR-375467A; State v. Michael (Dec. 15, 1999), Seneca App. No. 13-99-41;State v. Parker (Dec. 9, 1999), Cuyahoga App. Nos. 75117, 75118, dismissed, appeal not allowed by 88 Ohio St.3d 1480; State v. Sargent
(1998), 126 Ohio App.3d 557, 568; State v. Blankenship (Dec. 9, 1998), Summit App. No. 18871; State v. Jeffery (Jun. 30, 1997), Franklin App. No. 96APA08-986, dismissed, appeal not allowed by 80 Ohio St.3d 1433;State v. Dancy (Sept. 1, 1995), Greene App. No. 94-CA-24; State v.Morris (Feb. 13, 1989), Butler App. No. CA88-06-08; State v. Brown
(February 8, 1983), Montgomery App. No. 7710.
[17] Newcomb, supra; State v. Prade (2000), 139 Ohio App.3d 676,685.
[18] Id.
[19] See Imwinkelried, Uncharged Misconduct Evidence (1995), Section 3:15.
[20] State v. Broom (1988), 40 Ohio St.3d 277, paragraph one of the syllabus, cert. denied, (1989), 490 U.S. 1075.
[21] State v. Morris (Feb. 13, 1989), Butler App. No. CA88-06-081, jurisdictional motion overruled by 43 Ohio St.3d 712, citing State v.Snowden (1976), 49 Ohio App.2d 7, 10.
[22] State v. Davis (1991), 62 Ohio St.3d 326.
[23] Id. at 339.
[24] Id. See, also, State v. Barnes (2002), 94 Ohio St.3d 21, 27; Statev. Perry (1992), 80 Ohio App.3d 78, 84.
[25] Barnes, 94 Ohio St.3d at 27 (citations omitted).
[26] State v. Bridgeman (1978), 55 Ohio St.2d 261.
[27] State v. Foster (Sept. 17, 1997), Seneca App. No. 13-97-09.
[28] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[29] R.C. 2901.22(B).
[30] State v. Williford (1990), 49 Ohio St.3d 247, 249, quoting Statev. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
[31] State v. Jackson (1986), 22 Ohio St.3d 281, 284.
[32] State v. Aria (Dec. 8, 2000), Hamilton App. No. C-990848.
[33] State v. Burns (Aug. 3, 2000), Cuyahoga App. No. 69676.
[34] State v. Barnd (1993), 85 Ohio App.3d 254, 260.
[35] State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
[36] Id., quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
[37] Id.
[38] State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
[39] Strickland, 466 U.S. at 689-90.
[40] State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666, citingState v. Edwards (Feb. 17, 1998), Clermont App. No. CA97-04-035.
[41] Bradley, 42 Ohio St.3d 136, at paragraph three of the syllabus.
[42] State v. Waddy (1992), 63 Ohio St.3d 424, 433, citing UnitedStates v. Bagley (1985), 473 U.S. 667, 682.
[43] State v. Ward (Aug. 17, 1992) Allen App. No. 1-91-63, State v.Robinson (May 31, 2002), Union App. No. 14-02-01.
[44] Barnes, 94 Ohio St.3d at 24.
[45] State v. Wetherall (March 22, 2002), Hamilton App. No. C-000113, 2002-Ohio-1613 (citations omitted). See, also, State v. Baker (1993),88 Ohio App.3d 204, 211.
[46] See, e.g., Jenkins v. Metropolitan Life Ins. Co. (1961),171 Ohio St. 557, paragraph two of syllabus.